UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ANADARKO PETROLEUM CORPORATION, § § § Plaintiff, § VS. § NOBLE DRILLING, U. S. LLC; § CERTEX USA, INC., BRIDON § AMERICAN CORP., AND BRIDON § INTERNATIONAL, LTD. § Defendants. § | CIVIL ACTION NO. H-10-4033 |

**<u>MEMORANDUM AND ORDER</u>**

## I.   INTRODUCTION

Before the Court is the plaintiff and third-party defendants, Noble Drilling Service, Inc., Noble Drilling (U. S.) LLC, and Noble Drilling Services LLC's ("Noble") motion for summary judgment directed to claims asserted by third-party plaintiff, Anadarko Petroleum Corp./Kerr-McGee Corporation ("Anadarko") [Doc. No. 193]. Anadarko filed a response in opposition to Noble's motion. [Doc. Nos. 231 and 234]. In turn, Noble filed a reply [Doc. No. 252]. Shortly after Noble filed its motion, Anadarko filed its own motion for partial summary judgment [Doc. No. 199] to which Noble filed a response [Doc. No. 223]. These matters are now fully before the Court and include supplements and appendices. Being fully informed, the Court determines that Noble's motion for summary judgment should be granted.

## II.   FACTUAL BACKGROUND

The suit brought by Anadarko arises out of two contracts for the use of Noble's offshore drilling rigs. The first of the contracts between the parties was executed on April 12, 2001. It was a "day work" drilling contract that involved the *Noble Paul Romano* ("NPR"). The second

contract was executed on March 8, 2008, and it was also a daywork drilling contract, that involved, however, the *Noble Amos Runner* ("NAR"). As the contracts matured and as circumstances dictated, the parties executed various letter agreements that had the effect of amending and/or extending the contracts.

As a result of hurricanes in the Gulf in 2005, Noble set out "to upgrade its rigs to improve their station keeping ability." This upgrade was called the "NC-5" program. One of the principle aspects of the NC-5 program was to solicit Bridon and/or Certex to design and sell to Noble a superior wire rope for the purpose of achieving "station keeping ability" through a stronger mooring capability.

Noble introduced its NC-5 program to Anadarko in 2006. Pursuant to negotiations, Noble agreed to amend the NAR contract "for the installation of contractor's NC-5 mooring upgrade . . . ." According to the amendment, however, Noble agreed to pay the costs of the upgrade and Anadarko agreed to compensate Noble for "shipyard days," days when the rig was not in use and undergoing the upgrade, so that it could retain access to the rig. In turn, Anadarko sought to amortize the shipyard days "across the term of the commitment." Hence, Anadarko did not pay shipyard days during the installation of the NC-5 upgrades. As a result, the term of the NAR contract was extended by the period of days that the rig was in the shipyard under construction.

On July 13, 2006, Noble and Anadarko agreed to extend the NPR contract for 30 months. The NPR contract was also amended to address the installation of the NC-5 program upgrades. Again, as with the NAR, Anadarko agreed to compensate Noble for the shipyard days. On October 31, 2007 and April 24, 2008, respectively, upgrades on the NAR and NPR were completed and the rigs were returned to service in the Gulf of Mexico.

On or about September 12, 2008, both rigs lost station as Hurricane Ike swept through the Gulf. Noble, using its own resources, located the rigs, towed them back to station and repaired the wire ropes in preparation for re-commencing operations. Following re-commencement of operations in October of 2008, Anadarko invoiced Noble for approximately $24 million in costs associated with rig recovery efforts and the operations of the rigs for the two months following Hurricane Ike. Anadarko also invoiced Noble for its fixed costs that Noble contends were not caused by the rigs breaking away from station.

A review of both motions for summary judgment by the Court fails to disclose significant and material disputes concerning the underlying facts. Accordingly, the Court will address the parties' competing motions for summary judgment.

### III.   CONTENTIONS OF THE PARTIES (NOBLE'S MOTION)

####    A.   *Noble's Contentions*

Noble contends that summary judgment is appropriate on its behalf because Anadarko admits in its pleadings that Noble did not cause Anadarko's losses. Equally important to this result, Noble points out, and Anadarko admits, that the fault for its losses lies with Bridon and Certex. Noble also asserts that Anadarko's claims for the return of the day rate fails because Anadarko ratified Noble's "alleged" breach of the contracts' conduct by continuing to use the rigs. Noble contends that, by continuing to use the rigs under the terms of the contracts, Anadarko elected not to rescind the contracts and thereby ratified Noble's alleged breaches.

Noble also argues that Anadarko cannot recover what it claims as the "purchase price" of the NC-5 program upgrades. In this regard, Noble states that Anadarko did not purchase the wire ropes used in the upgrades. Moreover, Noble asserts, it installed the wire ropes, pursuant to the terms of their, Noble and Anadarko's, contracts, retrieved the rigs after they were displaced and

placed them back on station, replaced the damaged wire ropes and credited back to Anadarko the day rate for the service period that the rigs were off station. Hence, Noble contends, Anadarko incurred no expenses that it might recover under the terms of their contracts.

Finally, Noble disputes Anadarko's claim that Noble is liable to it under maritime law, and specifically its claim for: (a) breach of implied warranty of seaworthiness as it relates to the wire rope; (b) breach of a warranty of: (1) merchantability; (2) fitness for a particular purpose; (3) failure to maintain and repair the rigs; (4) implied warranty of good and workmanlike service; (c) quantum meruit; (d) recovery of "debris and wreckage" from the seabed; (e) recovery under paragraph 903(b) of the contract because it is an exception to the general liability provision of the contract; (f) "money had and received" because such a claim is established in common law, not admiralty law; (g) subrogation on any basis; and (h) offsets due to loss of use of the rigs because it changed out the wire rope in 2010.

## IV.     CONTENTIONS OF THE PARTIES (ANADARKO'S MOTION)

In its motion for partial summary judgment, Anadarko contends that Noble promoted its mooring design for the NAR and the NPR, the "NC-5" program, as capable of withstanding a category five (5) level hurricane. In spite of the fact that, a component of the design was the Bridon/Certex wire rope, Anadarko argues, Noble failed to test the breaking strength of the wire rope prior to installation. Therefore, when Hurricane Ike hit the NAR and NPR rigs, the wire ropes failed. Anadarko, also claims that, acting at Noble's direction, it expended funds in the recovery efforts of the NAR and NPR. and Noble has failed and/or refused to pay the invoice(s). Anadarko, therefore, seeks summary judgment against Noble for Noble's breach of: (a) the warranty of seaworthiness; (b) express warranty; (c) warranty of workmanlike performance; (d) implied warranty of merchantability; (e) implied warranty of fitness for a particular purpose; (f)

its contractual obligation to maintain and repair the vessels; and (g) its duty to remove the mooring debris and wreckage from the seabed.

In response to Anadarko's motion for partial summary judgment, Noble argues that Anadarko lacks standing to assert the claims under either product liability or maritime law. In addition, Noble asserts that it did not breach the contract, and refers the Court to paragraph 909 of the drilling contract(s), concerning its liability, if any, associated with the mooring system. Finally, Noble seeks summary judgment on Anadarko's claims.

## V.   STANDARD SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted.  *Id.* at 249-50; *see also Shields v. Twiss*, 389 F.3d 142, 149-50 (5th Cir. 2004).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 - 87 (1986); *Adams v. Travelers Indem. Co. of Connecticut,* 465 F.3d 156, 163 (5th Cir. 2006).  Where the moving party has met its Rule 56(c) burden, the nonmovant must come forward with "specific facts

showing that there is a *genuine issue for trial."* *Matsushita*, 475 U.S. at 586-87 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Adams*, 465 F.3d at 164. To sustain the burden, the nonmoving party must produce evidence admissible at trial showing that reasonable minds could differ regarding a genuine issue of material fact. *Anderson*, 477 U.S. at 250-51; 255; *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## VI. ANALYSIS AND DISCUSSION

### - A -

At all times, before and after Hurricane Ike, the relationship between Noble and Anadarko has been defined by the terms of the NAR and NPR drilling contracts. This fact is recognized by Anadarko in that it does not, by its pleadings, allege that Noble caused its losses. Nor does it assert that Noble breached the terms of the contracts due to a failure of the wire rope or the NC-5 program. Instead, Anadarko seeks to convert or construe the terms of their drilling contracts to give rise to a cause of action in tort and/or products liability. By describing the contracts for use of the drilling rigs as maritime contracts and, therefore, governed by admiralty law, Anadarko advances the argument that general maritime law, as it governs seamen, sales of goods, leases or bareboat charters, permits a suit against Noble based in tort. This cannot be. *See Ryan v. Pan-Atlantic Corp.,* 350 U.S. 124, 134 (1956); *see also Italia Societa v. Oregon Stevendoring,* 376 U.S. 315, 319-20 (1964).

*Ryan* involved a stevedoring contractor who entered into a service agreement with a ship owner. The Supreme Court held a stevedoring contractor liable to the ship owner for damages

sustained as a result of the stevedore's improper stowage of cargo. And, although the agreement was silent on the subject of warranties and standards of performance, the Court held that the essence of service agreement contract called for performance "properly and safely." Therefore the law of warranties, such as those seen in the manufacturing industry concerning the soundness of manufactured products, applies.

The element present in *Ryan* that is not present in the case at bar is the service agreement. As well, there is no underlying suit by an injured seaman for which indemnity might arise. *See Waldron v. Moore-McCormick Lines*, *Inc.,* 386 U.S. 724 (1967). While maritime law dictates that a vessel owner is obligated to provide a seaman with a shipworthy vessel, that doctrine does not extend to Anadarko, a drilling contractor. *Id.* Hence, Anadarko cannot convert its contract for the use of rigs for drilling services into a claim based in tort without a service agreement. *Id.*

The Supreme Court revisited this issue again in *Italia Societa* and reached the same results. *See* 376 U.S. at 319. It is undisputed that the drilling services contracts associated with the NPR and the NAR rigs did not address the subject of warranties, standards of performance, defects in the vessels or in the mooring design and installation. And, to the extent that the parties anticipated interruptions due to weather conditions or failed equipment, those eventualities are addressed in the contracts.

- B -

There is yet another basis upon which the Court determines that Anadarko cannot prevail on tort claims against Noble. The basis for Anadarko's suit against Noble is essentially the same as Noble's suit against Bridon and Certex. The basis for Noble's suit is the purchase order for wire rope and any attendant representations that accompanied the purchase. In that circumstance, Noble is the consumer. The evidence shows that Anadarko was not a party to the contract and,

therefore, not a consumer. Nor is there evidence supporting a third-party beneficiary claim against Noble, assuming that Noble were to prevail against Bridon and Certex. Hence, there does not exist a basis for Anadarko to sue Noble outside their contracts.

- C -

Finally, Anadarko asserts claims for breach of contract against Noble. In this regard, Anadarko contends that Noble failed to maintain and repair the two vessels, failed to remove debris and wreckage from the seabed, and seeks losses due to the failure of the mooring lines. Anadarko's suit is prescribed by the contracts and the agreed amendments to them for the installation of the mooring upgrades. Noble asserts that it agreed to pay the cost associated with the installation of the upgrade with the understanding that Anadarko would compensate Noble for the shipyard days in order that it might retain access to the rigs. The cost of the shipyard days was amortized over the remaining life of the contracts. Therefore, any assurances concerning the condition and maintenance of the NAR and NPR rigs are contained in the contracts. The Court has not found any assurances.

Noble also contends, as it relates to the expense of locating the rigs, placing them back on station and repairing the mooring lines, that it incurred more than $43 million in expenses. Nevertheless, Anadarko invoiced Noble for the costs it allegedly incurred following Hurricane Ike until the rigs were back on station. As a result, Noble asserts that Anadarko has waived any claim for breach of contract, having elected to continue performing under the contracts.

Concerning Anadarko's claim that Noble is contractually liable for the recovery of the mooring equipment, Noble contends that the contract holds Anadarko responsible for damage to subsea equipment and that anchor wires, chain and anchors deployed below the surface of the sea

constitute equipment of the rigs as defined in paragraph 903(b) of the contract. Therefore, Anadarko is responsible for the mooring equipment pursuant to the terms of the contract.

### - D -

Addressing Anadarko's contractual claim in reverse order, the Court determines that regardless of how paragraph 903(b) is interpreted, a claim for breach of contract is a non-starter. Noble, at its own expense provided the new mooring system for the NAR and NPR rigs. According to Noble, and it is undisputed, the engineering, equipment and installation of the new mooring system was provided by Noble. Hence, the parties' course of dealing resolves any liability question.

The current contracts do not specifically define what constitutes subsea equipment. However, a prior contract between Noble and Kerr-McGee, Anadarko's wholly-owned subsidiary, stated that "any and all components or equipment located below the waterline shall herein be defined as subsea equipment." The Court is of the opinion that anchor wires, chain and anchors, deployed below the surface of the sea, constitute subsea equipment.

The Court is also of the opinion that Anadarko ratified Noble's alleged breach of contract claim when it agreed to continue performing under the terms of the contracts and adjusted the contracts' terms, accordingly. *See Turner v. Miller Transporters, Inc.,* 852 So. 2d 478, 487-88 (La. Ct. App. 2003) (internal citation omitted). It is undisputed that Anadarko elected to continue under the contracts even through it was fully aware that the mooring lines had failed during the storm.

Anadarko's claims for damages also fails. It asserts that on February 4, 2009, it submitted written invoices to Noble for services that it performed in the rig recovery efforts. However, the parties, pursuant to the contracts, had already allocated the risk associated with events such as

Hurricane Ike. Anadarko cannot be heard now to say that the contractual terms do not apply to services allegedly performed in the recovery efforts. According to the contract, the parties anticipated routine costs, emergency costs and repairs, and replacements. Noble replaced the defective DB2K wire ropes at its expense, and credited Anadarko the day rate while the rigs were unavailable. Hence, there are no expenses that Anadarko can claim under the terms of the contract.

Based on the foregoing analysis and discussion, the Court GRANTS Noble's motion for summary judgment in its entirety, and DENIES Anadarko's motion for partial summary judgment in its entirety.

It is so Ordered.

SIGNED at Houston, Texas this 2nd day of March, 2012.

_____

Kenneth M. Hoyt
United States District Judge